The Honorable Justice of the United States Court of Appeals in and for the Seventh Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their assent to the court in no sitting. Glad to have the United States and this Honorable Court. Good morning, ladies and gentlemen. Our first case for argument today is in the matter of Aearo Technologies. Mr. Clement. Good morning, Your Honors, and may it please the Court. Paul Clement for the appellants. I'll endeavor to save five minutes for rebuttal. Nobody doubts that the automatic stay precluded further earplug litigation against the debtor Aearo in the MDL and in Minnesota. But the bankruptcy court held that neither the automatic stay nor its related to jurisdiction extended to the same litigation against 3M, despite the complete overlap of fact and defenses, the possibility of estoppel and record taint, shared insurance, Aearo's indemnification obligations, and Apelli's ongoing efforts to use statements by the MDL court post-petition against Aearo in this bankruptcy. That decision misunderstood both circuit law and the funding agreement. On the law, the bankruptcy court misread this court's case law on the scope of the automatic stay and related to jurisdiction. This court recognizes two exceptions to the general rule that the automatic stay applies only to claims against the debtor. And as to related to jurisdiction, this court misunderstood. How is it possible for there to be exceptions to the language of the automatic stay? The one thing that's been consistent in the Supreme Court's last 10 years of bankruptcy cases is the language controls, there are no exceptions, and it doesn't matter how extreme the circumstances are. All of the cases you rely on predate the modern Supreme Court's approach to bankruptcy law. So why should we recognize any exceptions at all? So two responses to that, Judge Easterbrook. I mean, obviously, if we were here on a complete clean slate, that would be a sort of more difficult question for me. Well, it is the question for you because we often say, you know, 30 years ago or 20 years ago, we said or the Fourth Circuit said, da-da-da-da-da. But there have been a lot of Supreme Court decisions since then, and we have to be consistent with them. So that's the question I'm asking you. In light of the Supreme Court's decisions, not ours, how can there be exceptions? So I think that – I mean, I wish the Supreme Court in the bankruptcy area had been quite as textualist as you suggested because if it were, then I wouldn't have a petition up there in a case I lost in the Fifth Circuit where the Fifth Circuit applied some pre-bankruptcy sort of, you know, dictum about non-solvent debtors and said the Supreme Court made me do it. So I think in order for there to be a situation where you'd have to say, look, the mood music from the Supreme Court about how to interpret statutes and this statute in particular is so clear we're going to walk away from our circuit precedent, for better or for worse, I don't think the Supreme Court has been that clear yet. The other thing that makes it kind of tricky is that in the Celotex case in the Supreme Court, which is obviously relevant to the related to issue, the Supreme Court – I mean it was a drive-by citation to be sure, but it cited the A.H. Robbins case favorably, which is sort of the source of the exceptions that this court applied. Well, we do know what drive-by citations count for. No, I – And what exceptions did we actually apply? So as I read – well, as I read this court's cases in Fernstrom and Fox Valley, the exceptions that this court has applied have been – Discussed maybe. Not applied. Yeah, I'm not sure we applied anything. We discussed some things. We mentioned it. We didn't rule it out. Right. It's the best you can say. Yeah, I mean, look, I see you applied in the sense that you took them seriously and found them inapplicable on the facts there. And so to me that is – that's not just dictum. I also think for what it's worth that even if you want to be a pure textualist, the thrust of A.H. Robbins and the thrust of the first exception this court has recognized is the idea that when you have a real party in interest, that's still within essentially the text. But, you know, what I'm having – I have a number of problems with your approach, but one of them is how you distinguish any regular old case of joint and several liability from this case. We all certainly understand that 3M and Arrow are very closely aligned in this litigation, but the automatic stay is supposed to be automatic. You're supposed to just see it. It happens. You're not supposed to have 25 hearings. So I just don't see how – unless you're going to say the automatic stay applies to everybody with joint and several liability, how your position can hold. So I wouldn't say – I obviously wouldn't say it applies to everybody. I would say that this is – Of course. Of course. But this seems to be, you know, a truly sort of unique case. This isn't just joint and several liability. This is a case where essentially 3M's liability in these cases is premised on a memo that Arrow wrote before 3M was in the picture. So it's a successor owner. This is every MDL virtually, right? I mean, one of the points that some of the amicus make, they suggest that if this maneuver works, why won't it automatically happen any time a defendant in an MDL starts to get uncomfortable with the MDL court's rulings? Well, I mean, Judge Hamilton, I mean, you know, I think that that question really goes more to the underlying merits of this than the questions that arise under the automatic stay and related to jurisdiction. And, you know, obviously you could have a situation where you'd say that, all right, there's related to jurisdiction, but I'm not going to exercise it because of some concern on the merits. And, you know, I think if you focus on the question that I think is squarely before you, which is the automatic stay, and if you are uncomfortable with the automaticness of the automatic stay, then I think related to under 105 provides sort of the clear answer here because I think it sort of blinks reality to say. And what the Supreme – I mentioned the Supreme Court's decisions, but the key one there is law from 2014, which long postdates A.H. Robbins and these other cases, which says you can't use Section 105 to fix what you think of as flaws in the bankruptcy code. You can carry out the bankruptcy code, but you can't extend it, contradict it, modify it, and so on. Isn't that a problem? No, I don't think so. We don't think there's anything wrong with the bankruptcy code, but one of the reasons we don't think there's anything wrong with the bankruptcy code is because it includes Section 105A. No, that's not the point of law. The point of law is you can't use Section 105A to do anything other than implement what's in the code, and of course what's in the code is Section 362. Well, I don't see how you use Section 105 to give you relief that Section 362 does not provide. Well, Judge Easterbrook, with respect, that would be a complete revolution in the precedent in this circuit and every circuit. We held exactly that in the Kmart case, even before law. Well, I don't think that is consistent with circuit law. I don't think that's consistent. I mean, I must be wrong because you wrote Bush, but I don't think that's consistent with Bush. No, courts are wrong plenty of times, as you often persuade the Supreme Court about courts of appeals. Well, and I don't think this court was wrong in Bush, and I don't think law carries all of the weight that you are suggesting, and I think if law carried all of that weight, I think then law would have silently sub silentio overruled cell attacks, and I don't think there's any suggestion of that. And so I do think the related to jurisdiction under 105A, which itself is something of a misnomer, right? The question is really related to jurisdiction under 1343B. I think, Mr. Clement, we're talking past one another. The question is not the scope of the related to jurisdiction. The question is what remedies does section 105 permit a bankruptcy code, bankruptcy judge to provide, when those remedies are in excess of considered limitations elsewhere in the code? The limitation in 362 is that the stay extends only to the debtor and its assets. But with respect, Judge Eastbrook, that's the automatic stay, and 105A is a stay that's not automatic. As Judge Wood sort of suggested, it doesn't happen just immediately, so it is susceptible to a process where the bankruptcy court finds out more information before it decides whether to stay this litigation. I mean, that's the thrust of a number of this court's decisions where this court has said, well, you know, maybe you don't come under the automatic stay, but you do come under 105A. The test there is related to, as Judge Wood was suggesting earlier, I mean, you know, if the automatic stay can't apply to all cases of joint and several liability, 105A allows a court to look at the specifics of the particular case, and, you know, it's hard for me to imagine a case that's more related to both the bankruptcy and the actions that have already been stayed against Eric. I'm not sure how far that gets you, though, because even if we were to agree with the position that 105A is still there, and some circuits have suggested that you just can't distort the language of 362 any further, but what you should do is look to 105A. And even if you could get over the related to jurisdictional barrier, now you're in a discretionary world. Now you're in a world where we would assess a district court's decision not to issue that kind of injunction, and we'd be talking about an injunction, not a stay, for abuse of discretion. We have all the facts on this record. The bankruptcy court made it quite clear that it wasn't inclined to issue this kind of stay, given the nature of the injunction, given the nature of the funding agreement. So I don't know if it gets you all the way home. Well, Judge Wood, let me say two things about that. One is I think really when you get to the decision to exercise discretion to not issue relief under 105A here, we're talking about one paragraph. And we're talking about a paragraph that I would submit is profoundly distorted by misunderstanding of the jurisdiction, which is what plainly seemed to drive the court's analysis. I also think there's a misunderstanding of how the funding agreement works, and I'd be happy to talk about that in a second. But I guess what I would say is, look, if I have to lose this appeal, I would much rather lose it on the ground that you are sketching out, which is to say, okay, 105A related to jurisdiction applies, but we're just going to, even though it's a paragraph, we're just going to sort of defer to that paragraph. It's a paragraph that comes after 30 pages of discussion of the case and the circumstances which don't really call for that kind of relief. With respect, though, what it really comes after is about 10 pages of misguided discussion about related to jurisdiction, and then it's followed by a paragraph that to me sort of puts the exclamation point on the misunderstanding because he essentially says, well, if I accepted Heaton's testimony, then there would be an actual economic effect. And it seems to me that if testimony is true, there would be an economic effect. It's sort of the definition of a potential economic effect, which should be enough for the jurisdictional inquiry. Can I ask you a question about the funding agreement? Sure. Under what conditions would 3M be excused from paying reimbursement requests from AERO? So if there was a failure in the reps and warranties, for example, that would satisfy it. But I think here's the most important thing that the bankruptcy court misunderstood, is if AERO makes a request for funding under the funding agreement before it has exhausted its own resources, then that is an improper request. Exhaustion is not actually the language of the agreement, though, is it? Solely to the extent that is the language of the agreement. Well, but it lets AERO make its own judgment. Let me go back to my question about under what conditions 3M could refuse a reimbursement request. For example, one of the conditions is AERO is supposed to provide a budget every two weeks. I assume it's been complying with that. It has, Your Honor. But would it be possible for 3M to order its wholly owned subsidiary, AERO, to breach the terms of that agreement so that 3M could repudiate the reimbursement obligation? So, I mean, you know, I'm not sure the answer to that question, frankly. And that's why— It seems pretty obvious to me that it could, right? It's a wholly owned subsidiary. And to the extent that anybody wants to take comfort from AERO's tying itself to the mast or maybe the rudder of 3M by its indemnification promise in return for this reimbursement request, the reimbursement request seems to me to be at the will of 3M. Well, that would actually strongly strengthen the case for granting relief against 3M. Well, it would really call into question AERO's promise to indemnify 3M, right? I suppose— You'd lose all the circularity. Yeah, exactly. And the circularity was what was critical to the bankruptcy judge's decision here. And I think it's, you know, the combination of the circularity and the uncapped nature of the commitment— But it's inconceivable that AERO would have gone forward with just a one-way indemnification agreement voluntarily two days before it filed for bankruptcy, right? I suppose that's right, though. I mean, AERO is facing enormous liabilities in this litigation, wholly apart from the indemnification agreement. But what I would say is, to me, the critical feature of the funding agreement that I think the bankruptcy court either misunderstood or failed to fully appreciate is that under the agreement, the indemnification responsibility of AERO starts with the first dollar, the first dollar of liability for 3M. But the reimbursement responsibility, if you will, doesn't start until the resources of AERO have been exhausted. And AERO continues to generate revenue from lines of business that are unrelated to the earplug litigation, which has been discontinued. And so there is a real difference here in terms of what's in the estate if you've stated the litigation against 3M. Under those circumstances, you have the cash on hand that AERO has. You have the ability to make claims on the shared insurance. And then you have 3M backstopping it all. But the shared insurance is problematic, isn't it? Because if it's really under 3M's control, then is it in the estate? I think it is in the estate. How can it be in the estate if 3M controls it, if 3M can just drain it off? I don't know that 3M can just drain it off, which is to say, I mean, if 3M tried to drain it off, I think the automatic stay would apply to that effort. It might not even be A3. It might be A1. Would 3M then consent to an injunction against 3M drawing on that insurance? I mean, it might well. If you think that's an asset of the estate, even though 3M is an independent owner, then presumably the bankruptcy court could and should enjoin 3M from drawing on it. Right, but it shouldn't stop there. The question I'm asking is whether 3M would consent to such an injunction. I think it would. I mean, I'd have to consult with them, but it shouldn't stop there. I know you want more relief than that, but I'm trying to figure out where 3M stands. I also wonder whether 3M is prepared to post a bond to cover the full value of all claims in the MDL litigation. I don't know the answer to that. Because under our circuit's law, the United Airlines case from 2005, if you're seeking any kind of injunctive relief beyond the stay, a full-value bond is required. I mean, 3M is going to have to tell us whether it wants that. I've got one further question, which is your brief is a little cagey about this, but are you seeking an injunction against the pursuit of the 2,000 state court cases in Minnesota? Yes, we are. How would that be consistent? If you're relying on Section 105, how would that be consistent with 28 U.S.C. 2283, the Anti-Injunction Act? I don't think ‑‑ I mean, first of all, obviously you're asking me a question that has not been briefed by my friends on the other side. I understand that. And I think it's the kind of issue that could be waived, but maybe you think it's jurisdictional in a way that it can't be waived, in which case I'd be happy to try to provide supplemental briefing on that. Certainly my understanding is there's not an anti-injunction problem with a 105A injunction that's directed to state court litigation. Certainly 2283, which says expressly authorized by law, you don't see any express authorizations for injunctions against state litigation in Section 105. So, again ‑‑ If the word expressly means, well, expressly, that's a big problem. Well, I would like to tell you, and if you want me to, I'd be happy to have the chance to, you know, Again, my understanding is I can cite you a raft of cases that have exercised 105 related to jurisdiction to enjoin state litigation, as well as federal litigation. And on top of all of that, it is true that at least when this case started, the principal focus was directed to the MDL litigation. And just in case, this is in the briefs, but just for the court's edification, I mean, you know, this is a situation where based on intervening developments in the MDL litigation, the MDL litigation against 3M has been stayed for other reasons. And that's part of the reason why I think that, you know, if this court is convinced that the bankruptcy court erred in its construction of the scope of 105 related to jurisdiction and wants to vacate and send it back for the bankruptcy court to reaffirm that it meant what it said in that paragraph or to address that issue anew, I think that would be an appropriate relief. If it weren't for the intervening stay, I would probably be here saying our hair is still on fire and we'd really like you to rule on the whole thing. But that does take a significant amount of the pressure off of things. That said, I don't think in any way moots this or the like because that stay is contingent on the 11th Circuit accepting interlocutory review and an appeal there. And the 11th Circuit has been noteworthy in neither accepting nor rejecting that interlocutory appeal. If I may ask one more quick question about 362 and its text. The bankruptcy code in other chapters does provide for automatic stays to extend to related parties in 1201 and 1301. We don't see that kind of language in 362 or in Chapter 11. Shouldn't that give us pause? No, I don't think so just for two quick reasons. One is it's true that A1 doesn't apply by its terms beyond parties, but things like A3 apply to property of the estate without regard to the debtor. So even as to Chapter 11, there are provisions that go beyond. Let's focus on A1 since that's the provision that is not parallel to 1201A and 1301A. Yeah, and what I would say is, you know, that would be another reason for but for circuit precedent perhaps to say we're not going to extend it beyond the debtor, but then you'd still get to 105A. And I think that this court has and other courts have said that as to 105A, there's a greater related to scope when it comes to reorganizations under Chapter 11 than under liquidations under Chapter 7. If I may. Thank you. Mr. Clement, we asked you a lot of questions, so you can prepare for two minutes of rebuttal. Mr. Frederick. Thank you, Judge Easterbrook, and may it please the court, David Frederick for the appellees. Arrow asks you to be the first appellate court ever to hold that a bankruptcy stay should extend to a non-debtor to halt litigation that will have no economic effect on the estate or creditors. The bankruptcy court found as a fact that 3M is more than able to meet its financial obligations under the funding agreement, so the attempt to stay cases against 3M doesn't help Arrow's creditors at all. It's designed to protect 3M. Arrow's wealthy parent corporation by giving it more leverage in negotiating defective earplug litigation claims. Because of the funding agreement, the bankruptcy court correctly found that the earplug suits will not affect Arrow's estate or its reorganization at all. 3M contrived this bankruptcy to help itself, not Arrow or its creditors. The second major point I'd like to make is that Arrow offers no limiting principle for its position. Under its position, and Judge Wood and Judge Hamilton, your questions have teased out some of this, any joint tort feeser, any wealthy parent corporation, any fully funded debtor can orchestrate a bankruptcy to get out of the civil justice system. That's functionally what they are doing, and they do not offer in their briefing or in the argument this morning any way in which ruling for them would not delimit the entire bankruptcy system. For those two major reasons, we submit that you have to affirm. Now, I'm happy to go through the individual specific points. We don't think that 362A1 applies because the earplug suits against 3M are not claims against the debtor. Your questions about the text we think are right on. The bankruptcy court was correct in saying that some other circuits have recognized atextual exceptions. It applies the same test, though, for unusual circumstances, and the bankruptcy court, we think, properly situated that analysis under 105. And I would actually like you to focus on 105 for a bit because, as my questions earlier indicated, I have trouble getting over the text of 362, which seems to speak of the debtor, not other people near the debtor. But 105 is a pretty broad discretion, and one could approach it, as Judge Easterbrook was saying, by saying the Supreme Court has warned bankruptcy courts and other courts not to take 105 as just a running license to do whatever you feel like doing. But maybe this isn't that. Maybe it's a way of looking at the particular facts and circumstances. Well, I think that the bankruptcy court properly did two things. It decided that it didn't have jurisdiction because the effect of this would not alter the partition of monies to the creditors. Now, this depended on, in a sense, a finding of fact, didn't it? But there was some question about whether 3M, for a long time, was saying, sure, we've got enough money to cover all of this. And then it backtracked and said, well, gee, maybe we don't. Right. But what the bankruptcy court did was it took testimony both from 3M witnesses, Mr. Dye, and the aero-disinterested director, Mr. Stein. And Mr. Stein's testimony was particularly persuasive to the bankruptcy court. Mr. Stein said he didn't foresee any circumstance in which 3M would not be able to fund. And that is logical if you look at its latest financial statements. 3M is an $80 billion company. It's ranked 102nd on the Fortune 500 list. It made revenues of $35 billion last year. It made profits of $5.9 billion. And there's never been a serious argument that it can't make the funding for the funding agreement. But in fairness, one can also point out that this MDL that lies often right here, it's kind of the elephant in the courtroom, what, 290,000 claims or so, the biggest one ever? That's a lot of exposure. It is a lot of potential exposure, Judge Wood, that has not yet been given evaluation. And so the problem is whether or not when you look at this from an ex-ante perspective and you have a funding agreement that says the subsidiary is going to wholly indemnify the parent but the parent is going to pay every last liability under that indemnification, whether you can say it's an ex-ante matter, that's not enough. So is there a factual dispute then between you and Mr. Clement? Because he's saying, well, actually, 3M isn't going to pay all of this, that Arrow has to exhaust its own resources first, that there's some bundle of money that's not under the indemnification. I was surprised to hear Mr. Clement say that because recital C to the funding agreement, which is on page 272 of the appendix, says that 3M is warranting its ability to pay and that it will pay. That is important because if it had not made that kind of recital representation, there would be a serious argument that this was a fraudulent transfer. In order to get out of a fraudulent transfer problem, 3M had to make that representation. So for counsel now to say, oh, we're reconsidering that, and in answer to Judge Hamilton's questions, there may be an order by the parent to the subsidiary to breach this so that 3M doesn't have to pay would get us into a very bizarre land where the bankruptcy system is being manipulated by a very wealthy parent that has every financial wherewithal to satisfy the claims, the potential claims of these service members who were sent into battle on a lie, that they were going to be given earplugs that were going to protect them from the sound that they were going to be exposed to, and 3M and Arrow knew that there was no data to back that up. And so it would be very odd to suppose that the bankruptcy system is now going to displace the entire civil justice system, which would enable juries to consider evidence of individual members and all of the other evidence attendant to the civil justice system and say we're going to put everybody in a big lump. To go by your brief and many of the amicus briefs, that's the question. But why wouldn't the bankruptcy judge relinquish jurisdiction rather than try to resolve a whole bunch of proceedings that otherwise would be in the province of the state courts or the Article III courts? We obviously aren't there yet, but to make a simple assumption that the bankruptcy judge will resolve all of the tort cases seems heroic. Your Honor, the question before you is whether the state… I know what's before us, but I'm not asking about that. No, I understand that. I'm asking why you're assuming that the alternatives are to resolve the tort claims in the MDL or to resolve them in the bankruptcy court with no jury and so on. Why isn't relinquishing jurisdiction a likely if not the required outcome? Well, we believe it is if what you mean by relinquished jurisdiction is for the bankruptcy court to say that this… Send it to a district judge. That is correct, and that is where it is now. Article III concerns. That's another line of Supreme Court case. And we're in accord with the notion that this was an improperly brought bankruptcy in two weeks. The bankruptcy court will be conducting a hearing on a motion to dismiss… For all I know, the bankruptcy court might relinquish jurisdiction, send it to a district judge, and the panel on multidistrict litigation would send it all to Florida. Well, I'm not here… We would have a very long and interesting excursion. In other words, send it to a district judge in Indianapolis. It has an element of circularity to it. I'm not here to argue about the MDL process. I'm here to rebut the arguments that have been made to extend a stay to this parent corporation that has the ability and has been taking sole responsibility for four years in litigating, and it took that position because it felt that it was in its economic interest to do so. Why? Because under many states' laws, non-economic damages get capped at $1 million per defendant. There were multiple ARO defendants along with 3M. ARO perceived it to be in its interest… Sorry, 3M perceived it to be in its interest to take sole responsibility, and it litigated on that basis throughout the entirety of the MDL process. And so when… And do you agree that the… I mean, it sounded to me as though the MDL process was on hold largely because 3M stopped doing things, but is there a formal order in place? There is an appeal that has been taken from a sanctions order issued by the MDL judge against 3M for changing its position four years into the litigation in saying, never mind that we have said we were going to defend these. It's actually on ARO. It's ARO's fault. And the judge sanctioned 3M for that change of position on which everyone had relied for four years, and that appeal is up on the… That's the one that's awaiting the Eleventh Circuit. That's correct, and there's been an administrative stay for purposes of allowing that appeal to go forward. And that's a stay by Judge Rogers? That's correct. That's correct. But I think that further to your point, Judge Wood, about the 105A, whether you view this from a jurisdictional perspective as these aren't really related to because they aren't going to affect the partition of the creditors or you view it from the bankruptcy court's perspective that the judge also would not issue a 105A injunction, which is a discretionary standard because it would not advance the purposes of the reorganization. I think you get to the same place, and if you were to say that there is some unusual circumstances inquiry to be done here, you wouldn't find that as a matter of fact for the reasons that the bankruptcy court gave, which is that there are no immediate economic adverse consequences by allowing this funding agreement because the state, ARO's estate, is going to be taken care of for purposes of the creditors and for whatever reorganization purposes ARO is seeking to achieve other than protecting its parent company from MDL litigation. So that takes us back really to the key finding that the bankruptcy judge made, which was that this was just a circular exercise with no real economic impact. That's correct. And I think that for that reason, it is important to understand from the creditor's perspective, and that's who I'm representing in this argument, from the creditor's perspective, if the funding agreement means what it says and if the 3M executives correctly said they would be responsible for those payments, the creditors are going to be taken care of. Now, Mr. Clement makes an exhaustion argument. Judge Hamilton, you're correct. The word exhaustion does not appear in the funding agreement. And what 3M has or ARO has ignored is that the provision under the permitted funding use has the words projected to be. So it's insufficient or projected to be insufficient. And Mr. Stein testified at the bankruptcy hearing that he believed that the ARO people could make that projection if circumstances warranted. And so the question is not whether or not there's a problem about taking the assets all the way down to nothing. The question from the creditor's perspective is, are they going to be paid by the invocation of this permitted funding use request for 3M to actually pay those claims? So if there's an exhaustion problem at all, it doesn't affect the creditors. It might affect the stockholders, except that 3M wholly owns ARO. And so as a matter of equity, we're talking about the difference between the equity of whatever value there is for 3M in that exercise versus what the creditors would be able to get out of a successful reorganization. And so for all these reasons, this circularity, it is important for the court to disavow the idea that wealthy corporations can get around their civil justice system requirements and demands by invoking the bankruptcy code and seeking to extend the stay provisions to that action. I'm happy to address the text of A1 and A3 if the court has questions about it, but we do think that these are not provided in A1. The bankruptcy court was right to say that more recent cases, 30 years after Robbins, have properly situated any exceptions under 105A where there is more discretion. And we read the caesar's opinion from this court as saying that 105A can't contravene a particular bankruptcy provision, but it can work in complementary fashion to the protection of the estate. And so to the extent that there is a concern there, we think that the discretion exercised by the bankruptcy court more than satisfies it. Mr. Frederick, can I ask you, suppose the facts were to change in the next year or two. The MDL proceedings get worse and worse for the defendants. Maybe there are larger economic shakeups in the world and 3M's credit rating drops and the promise of funding starts to look a lot shakier. Can you imagine circumstances in which the kind of relief 3M is seeking now or that Arrow is seeking on behalf of 3M could become permissible? I think it would be hard to imagine, and I will give you the historical example of the asbestos cases from Johnson Mansfield in the 90s and the A.H. Robbins case itself, which involved years and years and years of litigation that was directed against the parent in which the parent ultimately concluded it had to go into bankruptcy. It's hard for me, Judge Hamilton sitting here today, knowing what is on 3M's balance sheet and its boast that for 64 consecutive years it has increased its dividends to imagine a situation in which it would not be able to meet its financial obligations and have to declare bankruptcy. But if it did, the point of the bankruptcy process is to take the bitter with the sweet. 3M would have to disclose all of its information. It would have to subject itself to the bankruptcy process if there were financial grounds in which to do so. 3M would have to comply with all the other requisites of the bankruptcy process. In our view, it can't do that by hiding behind and pushing or prodding a wholly owned subsidiary to do its work for it. Thank you. The Court has no further questions. Thank you, Mr. Frederick. Mr. Janda. Thank you, Your Honor, and may it please the Court. Sean Janda for the United States Trustee. There's been a lot of discussion today about the specific provisions at issue in this case, and I'm happy to address any remaining questions that the Court has about those provisions. But in the absence of specific questions, I think it might be helpful just to take a step back and make a couple of fundamental points about the sort of power that Arrow is asking the Bankruptcy Court to exercise here and the problems that we, as the United States Trustee, have with that. So first, I think it's important to emphasize the extraordinary nature of this sort of 105 injunction. It interferes, if it's entered, with ongoing proceedings in other Article III court, maybe ongoing proceedings in state court, and even if it doesn't ultimately stop tort claimants from resolving their claims through the civil tort system that Congress has established, it certainly interferes with that process and delays that process. And candidly, we think Fisher establishes that the 105 injunction in this circuit may be appropriate in some circumstances, but I think both the extraordinary nature of that power and the Supreme Court's recent repeated clarity that 105 is not sort of a roving commission to do equity, it has to be tailored quite closely, any exercise of power under 105 has to be tailored to the specific provisions of the Bankruptcy Code that the court is trying to implement, really help underscore the very high bar that Arrow would have to meet before it could justify the exercise of that power. So let me ask you a question. The Supreme Court has indeed said those things about the Bankruptcy Code, but the other thing the Supreme Court has been on a campaign about is to make sure that we don't classify all sorts of things as jurisdictional if they really are more of a claims processing nature. And I wonder about the related-to assessment here in that light. The Bankruptcy Court thought, applying the ex-ante perspective and so forth, that related-to jurisdiction itself didn't exist. Then there is the paragraph that we've been talking about where the court says, and anyway, if I'm wrong about that, I actually would not issue an injunction for all the reasons I've just been discussing for the last so many pages. So where do you come down on the jurisdictional or non-jurisdictional nature of the related-to question here? Your Honor, we think certainly the related-to question is a jurisdictional question. I think there's a separate merits question about whether one-of-five authority could or should be exercised in these circumstances. And our reading of this circuit's case law is that the related-to definitely jurisdictional aspect is an ex-ante inquiry, but one that really requires, from the ex-ante perspective, an actual effect on the bankruptcy estate, and we don't think that's been shown here. I mean, to the extent that the court disagrees about how best to read this court's precedents and thinks the bar is something lower than that, then we think, sort of for almost exactly the same reasons, the Bankruptcy Court was correct to say that it would in any event not exercise whatever jurisdiction it might have. I'm not sure you're getting Judge Wood's question. It's one of mine, too. And perhaps it would help just to mention the cornerstone here, which is Bell against Wood. Right, to have jurisdiction, you have to make certain allegations and make a claim of a certain kind. But the Supreme Court has said failure to prove your claim just means you lose. It doesn't mean retroactively you had no jurisdiction. And it seems one could understand what the bankruptcy judge is saying is, well, they failed to prove their claim, therefore, retroactively, there's no jurisdiction. I wonder if that's where you think the Supreme Court is these days on jurisdiction versus substance. So that's not how we read the Bankruptcy Court's opinion, and that's not how I think we would read Bush, certainly. What we read the Bankruptcy Court to be saying is that sort of on the sort of facts before me, I can't find this sort of effect that would be required to exercise jurisdiction. And so why doesn't that just mean the party making this assertion loses, and then you cite Bell against Wood? Right, and that was kind of where I was going because I'm having trouble seeing much sunlight between your jurisdictional argument and your merits argument, which might mean that it's actually a merits argument, in which case you would say, yes, jurisdiction is all right. There's an allegation of an impact on the estate. There are allegations, and everybody's arguing here and there. And the bankruptcy judge is just saying, I just don't think there's enough of an impact. You haven't persuaded me maybe even that there's any, and so I'm going to make you lose on the merits. So that's just not how we read this court's precedence. I mean, I don't want to fight the court too hard on this because I think we are perfectly comfortable saying that on the merits, that 105 power shouldn't have been exercised. And we think, as you said, the questions really do merge in this context, at least sort of the threshold merits question that the bankruptcy court resolved the 105 issue on in the alternative. But that's just how we read this court's precedence. And I think if the court disagrees, then merits determination of the bankruptcy court could be affirmed. Okay. Thank you. Okay. Thank you, counsel. Mr. Clement, anything further? Yes, I'd like to make three very quick points, three points in two minutes. First, you can look at 272A of the joint appendix, and you will find no contradiction with anything I've said here today. All that says is 3M will represent that it will pay. But the question is, what does it have to pay? And the important point to keep in mind is that it doesn't have to pay as long as Arrow has its own resources, and they have to use those first. And it doesn't use the word exhaust, but it does use the word solely to the extent that. And the projected-to language, this is my second point, the protected-to language doesn't sort of create some loophole or make that language not say what it actually says. That just means that if Arrow projects that it's about to get $20 million in new revenues in, it has to take that into account and can only ask for reimbursement from 3M to the extent that its on-hand resources that it projected to have gets it down. There's a $5 million cushion, but that's why if you go to our reply brief, and there's the example. If there's an indemnification obligation for a billion, they have $100 million in cash or projected cash. They can only make a reimbursement request for $905 million. That's why the estate is better off with the litigation stayed against 3M. But here's my last point, and this gets to this discussion you were just having about jurisdiction versus the merits. So there are important distinctions between jurisdiction and the merits, and it's worth getting it right. I think one of the distinctions is that if it's jurisdictional, you have to figure it out at the beginning of the case. That's why the Bush case says that it's an ex-ante inquiry, and that's why the ex-ante inquiry is to potential economic effect, not actual economic effect, which is why the bankruptcy court got an important question 100% wrong. And it would be fine, again, as I said, I don't want to lose this appeal, but if I have to lose this appeal, I would really like to lose this appeal on the ground that the bankruptcy court was wrong about jurisdiction, will affirm him because he probably meant to exercise some discretion, and that way, if the circumstances change, he could revisit it, but also that way, if you have a different case where there's a channeling injunction or something else related to jurisdiction matters, the hands won't be tied. Thank you very much. Thank you, counsel. The case is taken under advisement.